# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **United States of America,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case: 10-3029-01/02-CR-S-GAF** |
| | ) |
| **Wesley Paul Coonce and** | ) |
| **Charles Michael Hall,** | ) |
| | ) |
| **Defendants** | ) |

## ORDER

Pending before the Court is *Charles Michael Hall's Motion For Severance, Or In The Alternative, For Other Sufficient Relief, With Suggestions In Support,* filed December 25, 2012 [Doc. 223] and *Defendant's Renewed Motion For Severance,* filed by Wesley Paul Coonce on December 18, 2013 [Doc. 435].   The Government filed objections to both motions for severance and all parties have submitted their proposed redactions to the various statements.

The issue of severance in this capital case turns on the question of prejudice to both Hall and Coonce if a joint trial is conducted.   However, consideration of that question is not performed in a vacuum.   A court must weigh the potential for prejudice to a particular defendant caused by joinder against considerations of a judicial economy. *United States v. Anthony,* 563 F.2d 533, 538 (8th Cir. 1977).   To that end, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together."   *Zafiro v. United States,* 506 U.S. 534, 537, 113 S.Ct. 933, 937 (1993); *United States v. Shivers,* 66 F.3d 938, 939 (8th Cir. 1995).   Joint trials are favored because they "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial." *United States v. Lane, supra,* 474

U.S. at 449, 106 S.Ct. at 732. A court must look to the defendant's showing that prejudice would result from joinder and consider whether such prejudice can be avoided at trial. In light of various curative options, "[r]arely, if ever will it be improper for co-conspirators to be tried together." *United States v. Stephenson,* 924 F.2d 753, 761 (8th Cir. 1991); *United States v. Drew,* 894 F.2d 965, 968 (8th Cir. 1990).[1]

Coonce and Hall each assert that a joint trial would be prejudicial to them because the government will seek to introduce the various statements each made during the course of the investigation of this case which incriminate themselves and each other. Neither of them will testify at trial and be subject to cross- examination thus depriving the other of his constitutional right to confront the witnesses against him. The starting point for analyzing their respective claims of prejudice in this situation is the Supreme Court's decision in *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620 (1968). *Bruton* involved two defendants accused of participating in the same crime and tried jointly before the same jury. Only one of the defendants had confessed prior to trial. The confession named and incriminated the other defendant. The trial court in *Bruton* issued a limiting instruction which told the jury it should consider the confession as evidence only against the co-defendant who had confessed and not against the co-defendant merely named in the confession. Both defendants were convicted and the case appealed. The *Bruton* court held that,

---

[1] In broad terms, severance is not required when the defendants may have a better chance of acquittal in separate trials [*Zafiro,* 506 U.S. at 540, 113 S.Ct. at 938], when the evidence against a co-defendant is more damaging [*United States v. Pou,* 953 F.2d 363, 369 (8th Cir. 1992)], when one defendant's role in the conspiracy is minor [*United States v. Pecina,* 956 F.2d 186, 188 (1992)], when all of the evidence will not be admissible against all co-defendants [*United States v. Sparks,* 949 F.2d 1023, 1027 (8th Cir.1991)], when there is hostility among the defendants or one defendant may try to save himself at the expense of another [*United States v. Garrett,* 961 F.2d 743, 746 (8th Cir.1992)], or when there is anticipated exculpatory testimony of a co-defendant [*United States v. Foote,* 920 F.2d 1395, 1400 (8th Cir.1990)].

despite the limiting instruction to the jury, the United States Constitution forbids the use of such a confession in the joint trial, stating:

> [T]here are some contexts in which the risk that the jury will not, or can not, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system can not be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect . . . the unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross examination.

*Bruton,* 391 U.S. at 135-136, 88 S.Ct. at 1627-28 (*citations omitted*).

Subsequently, the Supreme Court clarified and limited the breadth of *Bruton* in *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702 (1987). In *Richardson*, two defendants were jointly tried for murder. During the trial, the confession of one of the defendants was admitted into evidence. Although the confession named the co-defendant, it was redacted so as to "omit all reference to" the co-defendant. As redacted, the confession indicated that the confessing defendant and an unnamed third party discussed the murder in the front seat of a car in which they traveled to the victim's home. During the trial, however, the non-confessing defendant testified she was in the back seat of the subject car. As such, in that context, the confession could have helped convince the jury that the non-confessing defendant knew about the murder in advance and had knowingly participated. The *Richardson* court held that this confession fell outside *Bruton*'s scope and was admissible (with appropriate limiting instructions) at the joint trial. The Supreme Court distinguished *Bruton* as a confession that was "incriminating on its face," while the confession at issue in *Richardson* amounted merely to "evidence requiring linkage" in that it became

3

incriminating as to the non-confessing defendant "only when linked with evidence introduced later at trial." *Id.* at 204, 107 S.Ct. at 1705. The court specifically held that:

> [T]he Confrontation Clause is not violated by the admission of a non-testifying co-defendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

*Id.* at 211, 107 S.Ct. at 1709.

In general, where a confession is redacted to refer to generic "persons" so as not to expressly implicate a defendant, the Confrontation Clause has not been violated. *United States v. Miller,* 995 F.2d 865, 867 (8th Cir. 1993) (confession redacted to refer to generic "persons in Minnesota"). However, in *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151 (1998), the Supreme Court reversed a conviction because a non-testifying co-defendant's statement was admitted after being redacted by substituting a blank or the word 'deleted' for the defendant's name. Thus, "notwithstanding cautionary instructions and neutral redactions, *Bruton* is violated when the fact that a statement had been redacted is so obvious as to lead the jury through ordinary inferences directly to a defendant." *United States v. Williams,* 429 F.3d 767, 773 (8th Cir. 2005). *See also Gray,* 523 U.S. at 194, 118 S.Ct. at 1156 (obvious indications of alteration are directly accusatory).

Turning to the facts in this case, the Court concludes that neither Coonce nor Hall have established a need for severance. Initially, it must be noted that Coone and Hall have each made statements and given confessions implicating themselves – all of which are much more incriminating of themselves than each other. That being said, the Court has considered each and every statement and has concluded that neutral pronouns such as "another person" or "another individual" can be substituted and the statements can be further redacted in such a way as to eliminate the Confrontation Clause concerns.

Coonce and Hall argue that such redactions – in a capital conspiracy case involving only two defendants – will lead the jury directly to each of them as the other individual referred to in each of their various statements.   In *United States v. Jones*, 1010 F.3d 1263 (8th Cir. 1996), the court addressed this issue:

> [The non-confessing defendant] argues that because he and [his co-defendant] were the only persons named in the indictment, and were the only defendants present in the courtroom, "[t]he jury could easily and logically conclude that 'they' and 'we' referred to [the non-confessing defendant and the confessor]."   But *Marsh* teaches that the issue is not whether it would be "easy" or "logical" for the jury to conclude that the co-defendant's confession was referring to the defendant.   The inquiry instead must focus on whether the co-defendant's redacted confession <u>itself</u> implicates the defendant; there is no violation where the confession implicates the defendant only when linked to other evidence.

*Id*. at 1270.   Although this case undoubtedly presents higher stakes resulting from the prejudice-despite-redaction issues than in a non-capital case, the Court nonetheless concludes that neither Coonce nor Hall have established a case for pre-trial severance.[2]   However, the District Court is well-aware of its continuing duty to grant a severance if and when prejudice becomes apparent, either before or during trial.   *Schaffer v. United States*, 362 U.S. 511, 514-516 (1960); *United States v. Engleman*, 648 F.2d 478, 480 n.5 (8th Cir. 1981).

After careful review of the arguments set forth in the pleadings and the proposed *Bruton* redactions submitted by all the parties, the Court finds the redactions/changes to the various

---

[2]     While pre-trial severance is not required, it should be noted that the manner in which a confession is dealt with at trial can tip the scales in favor of undue prejudice.   Thus, in *United States v. Long*, 900 F.2d 1270, 1280 (8th Cir. 1990), the Eighth Circuit found a *Bruton* violation had occurred because, during the testimony in which the statement was admitted into evidence, the prosecutor invited speculation and "led the jury straight to the conclusion that 'someone' referred to [the non-confessing co-defendant]."

statements set out below adequately address the concerns of the parties as set forth in their respective pleadings:

### A. COONCE STATEMENTS AND *BRUTON* REDACTIONS

The following are summaries of the various statements given by Coonce that the government seeks to use as evidence. The statements include those Coonce made incriminating himself and those he made implicating Hall as well. The Court addresses each statement in turn and finds the redactions required by *Bruton* to be those indicated by striking through the original text to be eliminated and bracketing the changes to be substituted for the eliminated original text.

### 1. COONCE STATEMENTS 1-26-10 BEFORE FBI INTERVIEW

**To Chris Mullins:**

"I need to talk to him [Lieutenant Relvas] because I did it."

**To Jaysen Relvas, Greg Baysinger and John Roberts:**

When Relvas asked what Coonce wanted, Coonce said "Just take me out of here. I killed him and you will see it on the camera." This statement was also overheard by Roberts.

Relvas got Baysinger, who then came over to Coonce's cell. When Captain Baysinger asked Coonce if he had done "it," Coonce responded – "Yes I did it, he was a fucking snitch."

When asked by Captain Baysinger how he had done it, Coonce responded – "I stomped on his throat after I tied his hands and feet."

The Court finds it unnecessary to redact these statements by Coonce as they do not implicate Hall.

### 2. COONCE 1-26-10 WRITTEN CONFESSION STATEMENT TO FBI SA PEAK

I Wesley Paul Coonce, Jr., date of birth April 17, 1980, an inmate at the U.S. Medical Center for Federal Prisoners (USMCFP),

Springfield, Missouri, was advised of the identity of FBI Special Agent Alan P. Peak, who displayed his official credentials to me. Agent Peak then advised me of my legal rights by reading them to me from an official Advice of Rights form. I agreed to be interviewed and voluntarily waived my rights as signified by my signature on the form. Agent Peak then asked me to explain to him and USMCFP Special Investigative Agent Michael Taylor what happened to inmate Victor Castro.

I have been back in the USMCFP for approximately nine months. I am currently serving a life sentence for Carjacking and Kidnaping and am being housed in 10B. Earlier this evening, I decided to do something to somebody. I entered Victor Castro's cell, tied his hands up, started kicking him in the throat, and stood on his throat until he stopped breathing. I had no real motivation for doing this and just felt like doing it. Castro told on me previously for a minor offense. Castro was always real mouthy and I once tried to get him to fight. Castro told prison staff that I was trying to get him to fight, for which I received no punishment. I was simply having a bad day today and took it out on Castro. Neither Castro nor any other inmate owed me anything.

Yesterday, some of the pool balls went missing from the recreation area. Some of the tough guys couldn't play pool and began accusing me and ~~Charles Hall~~ [another person] of taking them. Today, I decided "Fuck it. I'll just take it out on Castro." Castro wasn't one of the accusers regarding the pool balls, but I already had it out for him from previously telling on me, which I kept in my back pocket until something like this happened. Part of my motivation was trying to save face in front of my fellow inmates. I am not a white supremacist, and race played no role in the assault.

The assault on Castro occurred in Castro's cell. I and ~~Charles Hall~~ [another person] entered Castro's cell. I left briefly, and when I came back, Castro's hands were tied with tape ~~which another inmate uses for his "shit bag"~~. We closed Castro's cell door, sat him on the floor, then laid him on his back. ~~Hall~~ [Another person] used my shoe laces to tie Castro's feet together, placed a rag in Castro's mouth as a gag, and tied another rag on Castro as a blindfold. I kicked Castro in the neck a couple times. ~~Hall and I~~ [We] both then stood on Castro's neck until he stopped breathing. ~~Hall~~ [Another person] then checked Castro's pulse and hit him in the stomach to ensure he was dead. I thought Castro might have been dead after I kicked him in the neck a couple times, because I could smell his shit. After the assault, I went

downstairs, started drinking a cup of coffee and talking with other inmates. Two or three days ago, ~~Hall~~ [another person] and I discussed the assault on Castro. We discussed how to do it, when to do it, and how to avoid being seen by officers.

I am currently taking medication for a mood disorder. I am of sound mind and do not suffer from mental illness. I get a shot once a week or once every two weeks, but cannot recall the name of my medication. I got my normal dose of medication today. My mood disorder did not contribute to the assault on Castro. I simply wanted to kill him.

I provided this statement to Agent Peak on January 26, 2010. I have read this statement and now sign it because it is accurate and truthful to the best of my knowledge.

After review of this written confession by Coonce to Special Agent Peak, the Court finds

the above-indicated redactions sufficient to address the *Bruton* issues presented.

## 3.    COONCE STATEMENT MADE TO DR. DEMEIR, 1-27-10

After making his confession statement to the FBI, Coonce was interviewed by Dr. DeMier for Suicide Risk Assessment. During the Assessment, Coonce made the following statements to Dr. DeMier:

Coonce stated that he was "anxious, waiting for this to get over." When asked to clarify, Coonce stated that he was anxious while "waiting a couple of days to get done with [the homicide victim]."

Coonce also stated "It's not like I was going home anytime soon. All they're gonna do is give me another life sentence."

Coonce stated that he was angry having been placed on suicide watch and said "I just killed a dude. Why would you put me on Suicide Watch? It doesn't make sense."

Coonce also stated that "I did what I did. Y'all didn't do anything to me. What I did, I did by my choice."

After review of these statements by Coonce to Dr. DeMier, the Court finds redaction

unnecessary inasmuch as none of the statements implicate Hall.

## 4.  COONCE STATEMENT TO SA MCLAIN, 1-27-10

Coonce shown SA McLain the place on Castro's cell wall which he stated ~~both Hall and Coonce~~ [he] touched while stepping down on Castro's neck.

After review of this statement by Coonce to SA McLain, the Court finds the above indicated redaction sufficient to address the *Bruton* issue presented.

## 5.  COONCE LETTER, 2-1-10

On February 1, 2010, SIS Officer Mike Cupp seized a letter from Coonce's cell which had been addressed to his stepmother, Pebble Coonce.  The letter contained the following statement:

Hey How are you doing? Me I could be better But I made a messed up choice well look I am gonna be honest with you and always rember that I love yall so much well I Killed a Guy the 26th of January why I did it I don't want to explain Right Now but I did an it's to late to change anything.

After review of these statements by Coonce in a letter seized from his cell, the Court finds redaction unnecessary inasmuch as none of the statements implicate Hall.

## 6.  COONCE STATEMENT TO SA MCLAIN, 2-3-10

Coonce, on 2-3-10, made the following statements to SA McLain:

Coonce advised that he thought that someone had offered Castro $50 to ~~let Coonce and Hall tie him~~ [be tied] up. Coonce stated that he was not the person that discussed it with Castro, and did not know if ~~Hall~~ [another person] discussed it with Castro, ~~but informed SA McLain that he should talk to Hall since "Hall was apparently telling us everything."~~[.]

Coonce refused to discuss those inmates that he took to see Castro's body. Coonce stated that SA McLain could determine this for himself by looking at the video. Coonce stated that he was not "putting no ones' names out there. " Coonce stated that "~~Charles Hall~~ [Another inmate] is my attorney, everything you need to know, why don't you go talk to him."

Coonce also stated that he did not have any regrets about killing
Castro and added that he wished he had done it sooner.  Coonce
added that he had not lost any sleep over the matter.  Coonce also
stated that this was the last time he would talk to investigators and
stated that nothing could be done to him since he was serving a life
sentence anyway.

After review of this statement by Coonce to SA McLain, the Court finds the above

indicated redaction sufficient to address the *Bruton* issue presented.

## 7.    COONCE TELEPHONE CALL, 2-7-10

On February 7, 2010, Coonce made a telephone call to "Brooke"
later identified as Lynn McGlashan, during which Coonce made the
following statements:

COONCE:     And I'm facing another charge . . . it's a murder
            charge.
            * * *
BROOKE:     Was it just you or is there other people?
COONCE:     There was one other dude.  Me and another dude.
BROOKE:     Why would you do that?
COONCE:     Shit happens.
            * * *
COONCE:     . . . I know . . . Lynn, Lynn, I can't do that because
            they're gonna stop my mail.  They're gonna stop my
            . .  I just did that to my mom, I told my mom exactly
            cause the dude gave me one stamp. I used the stamp
            and I put on there that I killed the dude and  . . . they
            stopped the letter.  They came and told me they
            refused to send the letter out.  They sent it to the
            prosecutor.
BROOKE:     . . . okay . . .
COONCE:     . . . as evidence.  So I'll-I'll-I'll tell you, but
            I'll-I'll-I'll be vague about what I say . . . so
            hopefully it'll go out then. But uh . . . (Pause) I don't
            know what to say. I fucked up! Anger got the best of
            me.
            * * *
BROOKE:     . . . I still don't know how you could do that?
COONCE:     I don't know, I just got mad.  My-my emotions got
            the best of me (long pause) I mean there's no reason

10

|  |  |
|---|---|
|  | why I did it, I just . . . I just . . .   my emotions got the best of me.  (long pause) Hello? |
|  | * * * |
| COONCE: | That's the way I am, Brooke.  I don't make good decisions. |

After review of these statements made by Coonce during a telephone call, the Court finds

redaction unnecessary inasmuch as none of the statements implicate Hall.

## 8.    COONCE TELEPHONE CALL, 2-22-10

On 2-22-10, the defendant had a telephone call with Pebble Coonce, his step- mother, during which Coonce made the following statements:

| | |
|---|---|
| COONCE: | And uh . . . you know, I-I might've ruined my life this time, but . . . you know, I don't want to see them doing it.  And I won't find out cause there's a dude here who killed another dude at another prison . . . |
| FEMALE VOICE: | This call is from a federal prison. |
| COONE | . . . at another prison and he waited two years for them to press charges on him, so . . . I don't ri-I hope I don't have to wait that long because I've already admitted that I did it, so hopefully it'll speed it up. |
| PEBBLE: | What, did you want this? |
| COONCE: | No!  I was just – they caught me on camera, mom!  I was caught on camera anyways.  So wh-why lie to 'em?  It's just gonna piss 'em off more.  I was just honest because I did it, they caught me on camera doin' it . . .  so-so why-why lie about it? |
| PEBBLE: | (Sniffles) |
| COONCE: | Well-I mean-if-even if I did, it wouldn't have mattered, they caught me on camera, mom! |
|  | * * * |
| PEBBLE: | (sigh) . . . I don't hate you.  I don't understand, but I don't hate you . . . |
| COONCE: | . . . well that's just my life cause I don't understand it either. |
| PEBBLE: | I don't think you had to take it that far. |
| COONCE: | I was just – my anger got the best of me and |

11

I-I ac-acted on anger.   And uh . . . it just-it . . . just happened.

After review of these statements made by Coonce during a telephone call, the Court finds

redaction unnecessary inasmuch as none of the statements implicate Hall.

## 9.    COONCE STATEMENT IN PRISON YARD, 3-31-10

On March 31, 2010, Coonce made the following statement to inmates Rosemond, Jones and Villagran in the recreation cages at the prison in Springfield. The statement was overheard by Senior Officer Specialist Gary Jenkins:

| COONCE: | They don't even have to fuck with a trial.  I told them from the get go that I did it. |
| ROSEMOND: | For real? |
| COONCE: | Yeah. So that is what I am saying. It's a done deal. I already copped to it so just ship my ass out of here.  I'm doin' life already, but now there talking going after the death penalty. |
| ROSEMOND: | You won't get any death penalty.  Motherfuckers killn' each other all the time and some of them don't even get a life sentence. |
| COONCE: | Oh well.  I got a sweet room with my own shower area. |
| ROSEMOND: | No shit!  How big is that room? |
| COONCE: | It ain't huge but it's a lot bigger than the others.  Big enough I can actually walk around the room and not just back and forth. |
| ROSEMOND: | (Unintelligible) |
| COONCE: | They'll probably send my ass to the ADX and forget me.  That shit'll work for me. |

After review of these statements made by Coonce to other inmates, the Court finds

redaction unnecessary inasmuch as none of the statements implicate Hall.

## 10.    COONCE STATEMENT TO DR. BRANDI REYNOLDS, 5-16-11

On 5-16-11, Coonce made the following statement to Dr. Reynolds at USP- Terre Haute:

12

Coonce stated that "it really doesn't matter to me though. I did what I did to get the death penalty." Coonce further stated that if he did not get the death penalty for this case that he would "keep killing and killing until they give me the death penalty." Coonce further stated that he did not "know what else to do."

After review of this statement made by Coonce to Dr. Reynolds on May 15, 2011, the

Court finds redaction unnecessary inasmuch the statement does not implicate Hall.

## 11. COONCE STATEMENT TO DR. BRANDI REYNOLDS, 12-1-11

On 12-1-11, Coonce made the following statement to Dr. Reynolds at USP- Terre Haute:

Coonce stated that "I am gonna get the death penalty. I killed another inmate. I mean I never had a chance. I put myself in situations in life that never gave me a chance." Coonce stated that he had spent most of his life in prison due to a string of bad choices that he had made and that regardless of knowing his future sentencing, it was difficult to accept it. Coonce stated "I don't know why. I am not living now."

After review of this statement made by Coonce to Dr. Reynolds on December 1, 2011, the

Court finds redaction unnecessary inasmuch the statement does not implicate Hall.

## 12. COONCE LETTER, 6-13-12.

On 6-13-12, Coonce sent a letter to his biological mother, Linda Coonce, in which he wrote the following:

Well I think my lawyers are gonna try to get my court date set back again. I don't want that. I am tired of all this shit. I know this it didn't take this long to kill the asshole☐

After review of this statement made by Coonce in a letter to Linda Coonce on June 13,

2012, the Court finds redaction unnecessary inasmuch the statement does not implicate Hall.

## 13.  COONCE TELEPHONE CALL, 8-19-13

On 8-19-13, Coonce made a telephone call to Pebble Coonce during which he made the following statements:

| | |
|---|---|
| COONCE: | My trial starts in uh . . . |
| PEBBLE: | April, right?  . . . |
| COONCE: | . . . April, yeah, April twenty-eighth.  Uh. . . (dog barking in the background).  My co-defendant, the guy that did this with me? |
| PEEBLE: | Yeah. |
| COONCE: | He told these people that he would've killed me if he knew what I was in prison for. Come on man, what'd you doing?  He wouldn't done nothing.  He didn't even want to do this. |
| PEBBLE: | Well . . .how come him to say that  . . .  regardless, wouldn't that just  hurt him?    (Laughs) |
| COONCE: | He just-he's tryin' tryin'to look big in front of everybody, so he's saying things that . . . he –I dunno. |

After review of these statements made by Coonce in an August 19, 2013 telephone conversation, the Court finds the statements inadmissible during the guilt phase of trial inasmuch as any redaction consistent with the requirements of *Bruton* would inevitably destroy any relevancy to the issue of guilt.

## 14.    COONCE TELEPHONE CALL, 1-8-14

On 1-8-14, Coonce made a telephone call to Autumn Coonce, his sister, during which he made the following statements:

| | |
|---|---|
| COONCE: | I'm ready for this shit to be over with. I don't care what they do. (PAUSE) I really don't . . . |
| AUTUMN: | . . . Don't say it like that. |
| COONCE: | I don't |
| AUTUMN: | Yeah, you do . . . |
| FEMALE VOICE: | . . . This call is from a federal prison. |
| COONCE: | I don't care what they do. |
| AUTUMN: | Yeah, you do. |
| COONCE: | No, I don't. |

| | |
|---|---|
| AUTUMN: | Stop saying that. |
| COONCE: | I-I don't . Cause if-if they don't do the death penalty, I'm gonna do it |
| AUTUMN: | Huh? |
| COONCE: | If they don't give me the death penalty, I'm gonna do it again. |
| AUTUMN: | What are you talking like that, dude? That's-that's not cool. |
| COONCE: | That's just the truth. |
| AUTUMN: | And you're –that's –you're-aw, man! You're incriminating yourself by what you just said, you know that, right? |
| COONCE: | It don't matter. |
| AUTUMN: | These-you know these phone calls are recorded so you just nailed yourself right to a wall. |
| COONCE: | It's all good. There ain't nuttin' they don't have on me already. |

After review of these statement made by Coonce during a telephone conversation on January 8, 2014, the Court finds redaction unnecessary inasmuch the statements do not implicate Hall.

## 15.     COONCE TELEPHONE CALL, 1-31-14

On 1-31-14, Coonce made a telephone call to Pebble Coonce, during which he made the following statements:

| | |
|---|---|
| COONCE: | Yeah, so what? Next time . . . I might not be as lucky and may happen to me. You know what I'm sayin, so it's-it's easier to kill or be killed and that ain't right. |
| PEBBLE: | Was it really that situation, oh no, don't answer that. |
| COONCE: | No-no-no-it wa-no. I can tell ya. No it wasn't, but . . . I knew the chance of it happening to me . . . was very high . . . if I went back to a USP. So that's why-that's why I did it. |

After review of these statement made by Coonce during a telephone conversation on January 8, 2014, the Court finds redaction unnecessary inasmuch the statements do not implicate Hall.

## B.    HALL STATEMENTS AND *BRUTON* REDACTIONS

The following are summaries of the various statements given by Hall that the government seeks to use as evidence.    The statements include those Hall made incriminating himself and those he made implicating Coonce as well.    The Court addresses each statement in turn and finds the redactions required by *Bruton* to be those indicated by striking through the original text to be eliminated and bracketing the changes to be substituted for the eliminated original text.

## 1.    HALL STATEMENTS 1-26-10 BEFORE FBI INTERVIEW

**To John Roberts:**

> Hall stated "I did that" while pointing to Castro's cell."  Roberts asked what he meant and Hall stated "I killed Castro.  I stomped on his throat."

> While escorting Hall out of the unit, Hall told Roberts that Castro was a snitch and deserved to die.  Hall stated that he had tied both Castro's feet and hands and "they" stomped and stood on his neck.

**To Jaysen Relvas:**

> When Relvas approached Hall, he asked him what was going on. Hall replied that "we killed Castro."

After review of these statements by Hall, Court finds *Bruton* redactions unnecessary.

## 2.    HALL 1-26-10 WRITTEN CONFESSION STATEMENT TO FBI SA MCLAIN

> I, Charles Michael Hall, date of birth 04/06/1971, was informed of the official identity of FBI Special Agent Rick McLain.  Agent McLain advised me of my Miranda Rights as reflected on an advice of rights form which he read to me.  I agreed to be interviewed without an attorney present and signed the advice of rights form waiving my rights. Agent McLain then asked me to explain to him and United States Medical Center for Federal Prisoners, Special Investigative Support Technician Benjamin Ramos what happened to inmate Victor Castro earlier tonight.

Earlier this evening ~~Inmate Wesley Coonce~~ [another person] and I walked into Castro's cell and then shut the door behind us. Castro was standing up at the time and I told him to turn around. I then bound Castro's hands with medical tape that I had in my possession and use in connection with my colostomy bag. After I bound his hands, I told him to lie down on the ground. Castro then laid down in a prone position on his back. I tied his ankles together using Castro's shoe laces. I then stuffed a cleaning rag (which I had with me) in his mouth. After that, I used another rag that I brought with me into Castro's cell and blind folded Castro with it. ~~Inmate Coonce~~ [Another person] then stomped on Castro's neck twice. Castro was still breathing so I placed my right foot on Castro's neck and stood on it with all my weight (about 200 lbs.) on my right foot. I placed my hand on the wall to balance myself and stood on Castro's neck for 5 to 10 minutes. Afterwards, I checked to see if he had a pulse by placing my fingers on his neck. I then punched him in the stomach to see if he had a pulse by placing my fingers on his neck. I then punched him in the stomach to see if he would react. He did not have a pulse and did not react to my punch so I was pretty sure he was dead. ~~Coonce and~~ I then left the room, stayed in the unit area and watched some television. We went back up to Castro's cell and looked in the window to see if he had moved at all. He had not moved so we were convinced he was dead.

Once we entered Castro's cell, I imagine he was surprised to see us. The only thing I recall Castro saying ~~to Coonce and me~~ before I placed the gag in his mouth was, "What's going on?" Castro did not yell at any point. I doubt any of the other inmates in the unit saw what took place since the jail cell door was closed.

~~Coonce~~ [Another person] and I discussed killing Castro 2 or 3 days ago. I would rather not say what we discussed in this meeting and I would rather not discuss why we killed Castro. I will not state that ~~Coonce's~~ [my] reason for killing Castro was the same as ~~mine~~ [anyone else.] I will say that I'm not a white supremacist and it had nothing to do with Castro's race. I do not know if ~~Coonce~~ [anyone else involved] is a white supremacist or not. I did not have any run-ins with Castro prior to this and he does not owe me any money. I will say, If Castro did not die, and I was given the opportunity to do this over again, I would kill Castro. If Castro was not available, I would have randomly selected another inmate and killed him.

I have been diagnosed as being bipolar but this did not have any effect on me or my decision to kill Castro. I have taken all the medications prescribed to me today and my medications had no role in my decision to kill Castro. I killed him because I wanted to kill him.

I provided this statement to agent McLain on January 26, 2010. I have read this statement and now sign it because it is accurate and truthful to the best of my knowledge.

After review of this statement by made by Hall to Special Agent McLain, the Court finds the above indicated redactions sufficient to address any *Bruton* issues.

### 3. HALL STATEMENTS MADE TO DR. BRINKLEY, 1-26-10; 2-1-10 and 3-1-10

After making his confession statement to the FBI, Hall was interviewed by Dr. Brinkley for Suicide Risk Assessment. During the Assessment, Hall made the following statements to Dr. Brinkley:

Hall stated that he felt on edge because of difficulty sleeping and that as a result he felt like murdering someone. Hall admitted that he murdered Castro with the aid of a peer. Hall stated that he did not feel excited or sad about the incident but instead felt calm. Hall noted that he would kill someone else if given the opportunity. Hall stated that he would be dangerous to others and said he felt safer in segregation.

After review of the above statement, the Court finds *Bruton* redactions unnecessary as it does not implicate Coonce.

### 4. HALL NOTE TO "CAPTAIN" 1-27-10

Hall, on 1-27-10 sent an Inmate Request to Staff form to "Captain" in which he wrote the following:

I'm being held on 10B Pending an investigation stemming from the murder of Victor Castro. I've spoken with the FBI and I've spoken to Dr. Garity and Dr. Brinkley a little. But I'm still feeling very homicidal. But I'm not going to hurt myself. The chance may

happen again and I'll be able to kill again. I'll have to kill as often as I can so you will take me seriously. It'll be staff or inmate it makes no difference. I can put a stop to it. Put me in a cell by itself with no human contact. Send me to the ADX or send me to death row. These are the only options. Sincerely, Charles Hall."

After review of the above statement, the Court finds *Bruton* redactions unnecessary

inasmuch as the statement does not implicate Coonce.


## 5.     HALL LETTER TO FATHER, 2-1-10

Hall, on 2-1-10, wrote a letter to his father, Charles Hall, Sr., in which he made the following statements about the homicide:

"My mail is being read and copied before they seel the envelope. And I don't want to screw up any defence I may or may not have. What I can say is that 3 of us were in a cell. Two of us came out."

After review of the above statement, the Court finds *Bruton* redactions unnecessary

inasmuch as the letter does not impermissibly implicate Coonce.


## 6.     HALL LETTER TO SISTER, 2-8-10

Hall, on 2-8-10, wrote a letter to his sister, in which he made the following statements about the homicide:

In the letter Hall stated that he had asked their mother for $6,750 because of a murder in the prison that he was accused of committing. Hall wrote, "I happened to be at the wrong place and the wrong time. Three of us were in a cell. Two of us left one was dead. This type of things happen in prison. It's pretty violent at times."

After review of the above statement, the Court finds *Bruton* redactions unnecessary

inasmuch as the letter does not impermissibly implicate Coonce.


## 7.     HALL STATEMENT TO SA MCLAIN, 3-23-10

On 3-23-10, Hall made the following statement to Special Agent McLain:

Hall stated that he had heard in the prison that inmates Foo and Bruesch had been interviewed about Castro's homicide, and that Hall was concerned that law enforcement was attempting to implicate them in the murder. Hall stated to SA McLain that, "If I do something I don't want someone else getting the blame." Hall stated that "Bruesch and Foo had nothing to do with it." SA McLain advised that there were no plans to charge them, ~~just Coonce and Hall~~. Hall stated that Castro was still alive when ~~Coonce~~ [the other person present] left Castro's cell, and that Hall was the person who actually finished killing Castro. Hall further stated that ~~neither he nor Coonce~~ [no one] offered to pay Castro any money in order to allow them to tie him up prior to killing him. Hall further stated that he had brought the medical tape used to bind Castro's hands before the murder and that ~~Coonce~~ [another person] had the shoelaces used to bind Castro's feet. Hall also stated that Castro was not the original target, and that Hall instead wanted to kill "four or five" prison employees, but it did not work out that way, so he and ~~Coonce~~ [another person] settled on Castro. Hall refused to identify the "four or five" employees targeted. Hall also stated that he felt "manic" and that his medicine was "not working and that a lot is a blur to me."

After review of this statement by made by Hall to Special Agent McLain, the Court finds

the above indicated redactions sufficient to address any *Bruton* issues presented.

## 8.     HALL LETTER TO AUSA EGGERT, 8-12-10

On 8-12-10, Hall sent a letter to the Assistant United States Attorney assigned to this case, in which he wrote the following:

Hall wrote that if the government would "guarantee" that if he pled guilty that he would receive the death penalty, Hall would plead guilty. Hall further wrote "the only thing that will stop me from killing again is to put me to death. That will not be limited to inmate, but staff as well. I just want to make myself clear on this issue. I will continue killing every chance I get."

After review of the above statement, the Court finds *Bruton* redactions unnecessary

inasmuch as the statement does not implicate Coonce.

## 9.    HALL STATEMENT TO SIS RAMOS, 10-19-10

On October 19, 2010, Hall made the following statement to SIS Ramos about the homicide:

On October 19, 2010, USBOP Officer Ramos was in Ward 10-D investigating an unrelated matter when Hall called Ramos over to his cell.  Hall, without any questions asked by Ramos, informed Ramos that "I have been straight with you from the beginning. I told you that I killed Castro and that only I did it.  You know that I am a leader and not a follower.  ~~Coonce didn't~~ [No one else] kill[ed] Castro, I did. If you look at the cameras you'll see that ~~Coonce~~ [someone else] comes in and out of the room and I stay in it. ~~Coonce doesn't have~~ [No one with me has] a hair in his ass to do something like this.  I just wanted to let you know this."

After review of this statement by made by Hall to SIS Ramos, the Court finds the above indicated redactions sufficient to address any *Bruton* issues presented.

## 10.    HALL LETTER TO AUSA EGGERT, 11-16-10

On November16, 2010, Hall sent a letter to the Assistant United States Attorney assigned to this case, in which he wrote the following:

Hall sent a copy of a letter that he had written to his defense attorney to the Assistant United States Attorney assigned to the case.  In the letter, Hall acknowledged that he was responsible for the homicide, and wrote that he believed he was eligible to receive the death penalty. Hall instructed his attorney that he wished to plead guilty to the murder of Castro, and that he wanted to agree to a recommendation of death.

After review of this letter by Hall to his defense attorney, the Court finds *Bruton* redactions unnecessary inasmuch as the statement does not implicate Coonce.

## 11.    HALL STATEMENT TO SIS RAMOS, 12-9-10

On December 9, 2010, Hall made the following statement to SIS Ramos about the homicide:

SIS Ramos was making rounds in Ward 10-D when Hall called him over to his cell. Hall, without prompting or questioning from Ramos, informed Ramos that Hall was leaving Springfield. Hall told Ramos that he had been told by other inmates that ~~Coonce~~ [another person] thought that Hall was going to testify against ~~Coonce~~ [him] and was an informant for the government. Hall further stated that he had discovered information of ~~Coonce's~~ [the other person's] past activity which, if Hall had known at the time of Castro's murder, would have caused Hall to have killed ~~Coonce~~ [the other person] and not Castro. Finally Hall stated that his attorneys had informed him there was a "98%" chance he would receive the death penalty, which is what Hall wanted.

After review of this statement by made by Hall to SIS Ramos, the Court finds the above indicated redactions sufficient to address any *Bruton* issues presented.

## C. ADDITIONAL STATEMENTS TO BE OFFERED THROUGH OTHER GOVERNMENT WITNESSES

## 1. TESTIMONY OF GOVERNMENT WITNESS SHARP

On 3-12-2014, the government represented in an e-mail to the Court and counsel, that Reginald Sharp will testify for the government at trial and will testify about events that occurred in Unit 10-B both before and immediately after the murder in the following manner:

Sharp will testify that about one week prior to the homicide that Coonce had told Sharp that someone in the unit wanted to get paid to be beaten up. On 1-26-10, after the murder, Sharp returned to the unit from being in the recreation unit and observed Coonce giving other inmates his personal belongings. Sharp asked Coonce why he was doing this. Coonce stated that Castro was dead and told Sharp that "I put it on my skin and on my momma" which Sharp interpreted as Coonce vouching for the truth of the statement that Castro was dead. After this, Hall came up to both Sharp and Coonce and stated in their presence, "this is what you get when you put 200 lbs and your knee on a man's neck for 10 minutes." Sharp told both Coonce and Hall that they were lying. Coonce asked Sharp if he wanted to see the body. Sharp agreed and went about 2/3rd of the way up the stairs and observed Castro's body in the cell after Coonce opened the door. While Coonce was discussing that Castro was dead, Sharp noticed that he was smiling and did not appear to be remorseful. After viewing the body, the unit's "pill

line" formed and shortly afterwards, prison officials discovered Castro's body. The inmates were locked into their cells. While in his cell, Sharp heard Coonce call one of the officers over to his cell and admit to the officer that he killed Castro. Later, Sharp also heard Hall start kicking his door and state that "I did it ~~too~~." Both were led away by prison officials.

In order to address potential *Bruton* concerns presented by the testimony regarding Hall's statement that he did it "too," the government has indicated that Sharp has been informed that when he testifies about this statement, he should eliminate the word "too" so that that statement from Hall would be "I did it." The Court agrees and has indicated the corresponding redaction above.

## 2.     TESTIMONY OF GOVERNMENT WITNESSES WRIGHT AND DURANT

On 3-12-2014, the government represented in an e-mail to the Court and counsel, that two inmates from Butner, North Carolina, Aaron Wright and Raymond Durant, will testify for the government at trial about events that occurred in Unit 10-B both before and immediately after the murder in the following manner:

Both inmates will testify that while at Butner, Hall informed them that he had killed a fellow inmate. In statements to inmate Wright, Hall told him that he had not liked the inmate that he had killed because that inmate had "pissed" on his (Hall's) bed. Wright stated that Hall ~~and a "co-defendant"~~ waited for the right moment to get the other inmate. Hall stated that he ~~and his co-defendant~~ grabbed the inmate and stabbed him. Hall then said that he had stomped on the inmate's neck trying to crush his windpipe to make sure that he was dead. Hall then said he watched as staff found the inmate's body and then how the staff had ~~first gotten his co-defendant and then Hall to~~ remove[d Hall] ~~them~~ from the unit. Hall shown both Wright and Durant autopsy photographs of the victim that Hall's attorney had left with him in the cell. Hall also shown both inmates pictures of the "weapon" that Hall claimed he used to stab the victim.

In order to address potential *Bruton* concerns presented by the statements of both Wright and Durant concerning how a "co-defendant" assisted Hall in the murder, the government has

informed Wright and Durant that when they testify, they can only discuss Hall's statements about how he planned and killed the victim, and not discuss the fact that there was a "co-defendant" who assisted Hall in the murder. The Court agrees and has indicated the corresponding redactions above.

Accordingly, it is

**ORDERED** that *Charles Michael Hall's Motion For Severance, Or In The Alternative, For Other Sufficient Relief, With Suggestions In Support,* filed December 25, 2012 [Doc. 223] and *Defendant's Renewed Motion For Severance,* filed by Wesley Paul Coonce on December 18, 2013 [Doc. 435] are **DENIED**. Further, as discussed with counsel during the pretrial conference in this matter on April 14, 2014, Judge Fenner has taken Hall's alternative request for sequential penalty phases under advisement at the present time.

  */s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**