IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10-03029-01-CR-S-GAF |
| | ) | |
| v. | ) | |
| | ) | |
| WESLEY PAUL COONCE, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT COONCE'S MOTION FOR ORDER
PRECLUDING THE GOVERNMENT FROM SEEKING THE DEATH PENALTY
ON THE GROUND THAT THE EIGHTH AMENDMENT BARS THE
EXECUTION OF AN INDIVIDUAL WITH A SERIOUS MENTAL ILLNESS,
NEUROCOGNITIVE IMPAIRMENTS, AND INTELLECTUAL DISABILITY**

TO THE HONORABLE GARY A. FENNER
UNITED STATES DISTRICT JUDGE
FOR THE WESTERN DISTRICT OF MISSOURI

COMES NOW Defendant WESLEY PAUL COONCE, JR., by and through undersigned counsel, and moves this Court for an Order precluding the government from seeking the death penalty on the ground that the Eighth Amendment bars the execution of an individual with a serious mental illness, neurocognitive impairments, and intellectual disability.

In the event the Court denies Defendant Coonce's motion for an Order precluding the government from seeking the death penalty, Defendant requests an instruction that if one or more jurors determines that Defendant Coonce is seriously mentally ill or suffers from an intellectual disability that the jurors must then cease deliberations and report that finding to the Court with the understanding the Court will impose a sentence other than death.

1

# UNITED STATES SUPREME COURT DECISION *HALL V. FLORIDA*, DECIDED MAY 27, 2014.

In *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), the United States Supreme Court held that the Eighth and Fourteenth Amendments to the Constitution forbid the execution of persons with intellectual disability. *Atkins* noted that the medical community defines intellectual disability according to three criteria: significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period. *See id.*, at 308, n. 3.

Yesterday, the Supreme Court issued an opinion in *Hall v. Florida*, --- S.Ct. ---- (2014) striking down a Florida law foreclosing further exploration of a capital defendant's intellectual disability if his IQ score was higher than 70. The Florida Supreme Court interpreted the Florida statute's definition of "significantly subaverage general intellectual functioning" as establishing a strict IQ test score of 70 and held that a person whose score is above 70 does not have an intellectual disability and is barred from presenting other evidence that would show his faculties are limited. Hall at 9. "Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70."

The United States Supreme Court held that the Florida Supreme Court's interpretation was unconstitutional for two reasons. The first is that "[i]t takes an IQ score as final and conclusive

2

evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence." *Hall* at 10. "Pursuant to this mandatory cutoff, sentencing courts cannot consider even substantial and weighty evidence of intellectual disability as measured and made manifest by the defendant's failure or inability to adapt to his social and cultural environment, including medical histories, behavioral records, school tests and reports, and testimony regarding past behavior and family circumstances. This is so even though the medical community accepts that all of this evidence can be probative of intellectual disability, including for individuals who have an IQ test score above 70." *Hall* at 9.

The second reason Florida's interpretation was held unconstitutional is because "[i]t also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise." *Hall* at 10. Florida's law disregards established medical practice that IQ tests should be read as a range, not as a fixed number, because each test has a standard error measurement. *Hall* at 10. "A score of 71, for instance, is generally considered to reflect a range between 66 and 76 with 95% confidence and a range of 68.5 and 73.5 with a 68% confidence. See DSM– 5, at 37 ('Individuals with intellectual disability have scores of approximately two standard deviations or more below the population mean, including a margin for measurement error (generally +5 points). . . . [T]his involves a score of 65–75 (70 ± 5)')." *Hall* at 11.

Here, Mr. Coonce's neurocognitive functioning – a 71 IQ score – places him in the range of subaverage intellectual functioning of an individual meeting the formal definition of intellectual disability. There has also been much evidence of deficits in adaptive functioning. Thus, the first two criteria of the medical community definition of intellectual disability are demonstrated.

The only criteria of the medical community definition that is not met is onset of these deficits during the developmental period. However, the *Hall* opinion illuminates the Supreme Court's view of categorical exclusions as "fluid" and one that should encompass an intellectual deficiency such as Mr. Coonce's that arose from Traumatic Brain Injuries suffered after age 18 instead of during his developmental period:

> To enforce the Constitution's protection of human dignity, this Court looks to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, supra, at 101 . The Eighth Amendment's protection of dignity reflects the Nation we have been, the Nation we are, and the Nation we aspire to be. This is to affirm that the Nation's constant, unyielding purpose must be to transmit the Constitution so that its precepts and guarantees retain their meaning and force.

*See Hall* at 5.

Just as an IQ score of 70 cannot be a formalistic cut off for determining if a person is suffering from an intellectual disability, the age of 18 cannot be the cut off for the onset of the deficits in intellectual functioning. The categorical exclusion from the death penalty should also encompass an individual suffering serious mental illness as that suffered by Mr. Coonce after the age of 18.

All of the Hall Court's discussion regarding the lack of penological purpose in executing a person with intellectual disability also applies to defendants for whom the onset of intellectual disability occurred after age 18:

> No legitimate penological purpose is served by executing a person with intellectual disability. [*6] *Id.*, at 317 , 320. To do so contravenes the Eighth Amendment, for to impose the harshest of punishments on an intellectually disabled person violates his or her inherent dignity as a human being. " [P]unishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." *Kennedy v. Louisiana*, 554 U. S. 407 , 420 (2008). Rehabilitation, it is evident, is not an applicable rationale for the death penalty. *See Gregg v. Georgia*, 428 U. S. 153 , 183 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). As for deterrence, those with intellectual disability are, by reason of their condition, likely

unable to make the calculated judgments that are the premise for the deterrence rationale. They have a "diminished ability" to "process information, to learn from experience, to engage in logical reasoning, or to control impulses . .. [which] make[s] it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Atkins*, 536 U. S., at 320. Retributive values are also ill-served by executing those with intellectual disability. The diminished capacity of the intellectually disabled lessens moral culpability and hence the retributive value of the punishment. *See id.*, at 319 ("If the culpability of the average murderer is insufficient to justify the most extreme sanction available to the State, the lesser culpability of the mentally retarded offender surely does not merit that form of retribution"). A further reason for not imposing the death penalty on a person who is intellectually disabled is to protect the integrity of the trial process. These persons face "a special risk of wrongful execution" because they are more likely to give false confessions, are often poor witnesses, and are less able to give meaningful assistance to their counsel. *Id.*, at 320-321. This is not to say that under current law persons with intellectual disability who "meet the law's requirements for criminal responsibility" may not be tried and punished. *Id.*, at 306. They may not, however, receive the law's most severe sentence. *Id.*, at 318 .

*Hall* at 5-6.

Just as the Court found executing a man whose intellectual disability's onset was during the developmental period contravenes our Nation's commitment to dignity, so too would permitting the government to execute a man who has suffered Traumatic Brain Injuries that have resulted in severe cognitive impairments after he was 18 years of age.

> The death penalty is the gravest sentence our society may impose. Persons facing that most severe sanction must have a fair opportunity to show that the Constitution prohibits their execution. Florida's law contravenes our Nation's commitment to dignity and its duty to teach human decency as the mark of a civilized world. The States are laboratories for experimentation, but those experiments may not deny the basic dignity the Constitution protects.

*Hall* at 16.

### EVOLVING STANDARDS OF DECENCY DICTATE THAT EXECUTING A MENTALLY ILL OFFENDER VIOLATES THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION

The Eighth Amendment's prohibition against imposing cruel and unusual punishments is "directed, in part, against all punishments which by their excessive length or severity are greatly disproportionate to the offenses charged." *Enmund v. Florida*, 458 U.S. 782, 788 (1982) (internal quotations omitted). In determining whether a sentence is disproportionate to the crime committed, the Court has looked to "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958)(plurality opinion). The Court has held that evolving standards of decency are violated by imposing the death penalty against juveniles and the mentally retarded.

In 2005, the Supreme Court in *Roper v. Simmons*, 125 S.Ct. 1183, held executing juveniles violated the Eighth Amendment. The Court in *Simmons* looked to the Eighth Amendment's ban on cruel and unusual punishments in the context of history, tradition and precedent. The Court noted that this framework, like that used in *Atkins*, required looking to "the evolving standards of decency that mark the progress of a maturing society" in reaching its decision. *Simmons* at 1190. Applying an analysis similar to that used for the mentally retarded, the Court held that juveniles should be immune from execution because of inherent difference between juveniles and adults that render them less culpable than the worst offenders the death penalty is intended to target. *Simmons* at 1195.

The Supreme Court has yet to examine the execution of mentally ill persons or intellectually disabled persons whose onset of disability occurred after age 18 and who – like juveniles and intellectually disabled persons whose onset occurred before 18 – are cognitively and emotionally limited in ways that directly impact upon their culpability. *See Atkins*, 536 U.S. at 306 ("[b]ecause of their disabilities in areas of reasoning, judgment, and control of their impulses...they do not act with the level of moral culpability that characterizes the most serious adult criminal

conduct."). It is fair to say, however, that the holdings in *Atkins* and *Simmons* were levied to remedy those very wrongs inherent in the execution of such severely mentally ill and intellectually disabled defendants whose onset of disability was after the age of 18.

In 2006 the American Bar Association House of Delegates, in language already previously adopted by the American Psychological Association and the American Psychiatric Association, unanimously passed the following resolution that would prohibit the execution of persons like Defendant Coonce who, at the time of their offense, had significant limitations in both their intellectual functioning and adaptive behavior resulting from traumatic brain injury, regardless of whether the traumatic brain injury was prior to or after the 18th birthday:

> RESOLVED, That the American Bar Association, without taking a position supporting or opposing the death penalty, urges each jurisdiction that imposes capital punishment to implement the following policies and procedures:
>
> 1. Defendants should not be executed or sentenced to death if, at the time of the offense, they had significant limitations in both their intellectual functioning and adaptive behavior, as expressed in conceptual, social, and practical adaptive skills, resulting from mental retardation, dementia, or a traumatic brain injury.
>
> 2. Defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law. A disorder manifested primarily by repeated criminal conduct or attributable solely to the acute effects of voluntary use of alcohol or other drugs does not, standing alone, constitute a mental disorder or disability for purposes of this provision.
>
> . . .

ABA House of Delegates Resolution 122A (2006), available at http://www.americanbar.org/content/dam/aba/directories/policy/2006_am_122a.authcheckdam.pdf (adopting the Task Force's proposal) (last accessed May 28, 2014).

The American Bar Association, long recognized as the leading legal organization in the country, has had its Guidelines pertaining to limitations on the utilization of the death penalty cited and adopted by the United States Supreme Court on numerous occasions. *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510 (2003); *Florida v. Nixon*, 543 U.S. 175 (2004); *Rompilla v. Beard*, 125 S.Ct. 2456 (2005). Thus, it is significant that the ABA House Of Delegates unanimously set forth a Resolution barring the death penalty for defendants suffering a severe mental disorder or disability. Wesley Coonce clearly fits the parameters of this Resolution, and to permit the government to seek the death penalty against him would violate the Eighth Amendment to the United States Constitution.

## INTERNATIONAL LAW PROHIBITS THE EXECUTION OF MENTALLY ILL OFFENDERS

### A. Introduction

Sentencing Mr. Coonce to death would also be in violation of principles of international law that this Court is bound to enforce. The exemption of the severely mentally ill from capital punishment is a recognized norm of customary international law which, having acquired the character of *jus cogens*, may not be deviated from under any circumstance. Lastly, the execution of a severely mentally ill offender is forbidden by Article 6 of the International Covenant on Civil and Political Rights, 999 U.N.T.S. 171 (1966), the provisions of which the United States is bound to respect as a result of its ratification of the treaty in 1992.

In the last few years the United States Supreme Court has noted the importance of international treaties, laws, and opinions in its decision-making process. *See*, *Atkins*, *supra* (execution of mentally retarded offenders "overwhelmingly disapproved" within the international community); *Lawrence v. Texas*, 123 S.Ct. 2472 (2003) (international treaty and opinion cited in condemnation of sodomy laws). The United States Supreme Court has relied on international law

to provide an objective set of standards for construing and interpreting the United States Constitution. Thus, for the last 50 years the United States Supreme Court has cited international law and opinion when it has had occasion to analyze the Eighth Amendment. See, *Thompson v. Oklahoma*, 487 U.S. 815, 830-831 (1988) ("The conclusion that it would offend civilized standards of decency to execute a person who was less than 16 years old at the time of his or her offense is consistent with the views that have been expressed by respected professional organizations, by other nations that share our Anglo-American heritage, and by the leading members of the Western European community"); *Enmund v. Florida*, 458 U.S. 782, 796 n.22 (1982) (death penalty for "felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe"); *Coker v. Georgia*, 433 U.S. 584, 596 n. 10 (1977) (the court looked to "the climate of international opinion concerning the acceptability of a particular punishment," specifically the death penalty for rape where death did not result); *Trop v. Dulles*, 356 U.S. 86, 102 (1958) (the Court looked to "[t]he civilized nations of the world [which were] in virtual unanimity that statelessness is not to be imposed as punishment for crime.").

   B.  **Treaty Obligations and the International Covenant on Civil and Political Rights**

International law, treaties and opinion dictate that persons with mental illness should not be subject to capital sentencing. Since state and Federal Courts are bound to enforce international treaties under the Supremacy Clause, subjecting Mr. Coonce to the death penalty would be in violation of international law. From the founding of this nation to the present day, international laws and treaties have been held enforceable in state and federal courts. *Chisolm v. Georgia*, 2 U.S. (2 dall.) 419, 474 (1973) (Jay, C.J.); *The Nereide*, 13 U.S. (9 Cranch) 388, 422 (1815); *The Paquete Habana*, 175 U.S. 677, 700 (1900); *Filartiga v. Pena Irala*, 630 F.2d 876 (2d Cir. 1980).

Indeed, under Supremacy Clause jurisprudence, international treaty obligations supersede any inconsistent state laws. *Ware v. Hylton*, 3 U.S. (3 Dall.) 199 (1796); *Missouri v. Holland*, 252 U.S. 416 (1920); *Antoine v. Washington*, 420 U.S. 194, 201 (1975).

The United States ratified the International Covenant on Civil and Political Rights (hereinafter the ICCPR) in 1992. The ICCPR specifically forbids arbitrary use of the death penalty: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." (999 U.N.T.S. 171 (1966), art. 6). Article 7 of the ICCPR provides, in relevant part: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment." *Id*. The interpretation and application of the ICCPR falls within the jurisdiction of the United Nations Human Rights Committee (hereinafter HRC), a panel of experts established under the ICCPR. United States courts have recognized that decisions of the HRC should be given great deference when interpreting the provisions of the ICCPR. *See, e.g.*, *United States v. Duarte-Acero*, 208 F.3d 1282, 1287 (11th Cir. 2000) (rejecting double jeopardy claim under the ICCPR based on Human Rights Committee rulings); *Maria v. McElroy*, 68 F. Supp. 2d 206, 232 (E.D.N.Y. 1999) ("The Human Rights Committee's General Comments and decisions in individual cases are recognized as a major source for interpretation of the ICCPR."); *cf. State v. Carpenter*, 69 S.W. 3d 568, 578 (Tenn. 2001) (stating that the ICCPR is the "supreme law of the land").

The HRC has interpreted this treaty to forbid the execution of persons with severe mental illness. Interpreting the ban on cruel, inhuman or degrading punishment enshrined under ICCPR Article 7, the HRC has declared: "When the death penalty is applied by a State party for the most serious crimes … it must be carried out in such a way as to cause the least possible physical and mental suffering." Human Rights Committee, General Comment 20, para. 6 (Forty-fourth session,

10

1992) (reprinted in Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI\GEN\1\Rev.1 at 30 (1994)).  In the case of *Francis v. Jamaica*, Communication No. 606/1994 U.N.H.R.C., on 12 August 1994, the United Nations Human Rights Committee held that the execution of an individual who was mentally disturbed, but examined and found not to be "insane," amounted in that case to cruel, inhuman or degrading treatment in violation of Article 7 of the ICCPR.  The Committee is of the view that arbitrary does not simply mean "against the law" but "must be interpreted more broadly to include elements of inappropriateness [and] injustice."  *Van Alphen v. the Netherlands*, (No. 305/1988), U.N. Doc. A/45/40, Vol. II, p. 108, §5.8.

While the United States issued a reservation to Article Six[1], the HRC has concluded that the reservation is invalid.  Eleven other signatory nations filed objections to the reservations of the United States; specifically Sweden, in its objection, points out that such reservations, in attempting to modify or exclude application of fundamental provisions of the ICCPR by invoking general principles of national law, undermine the basis of international treaty law.

C. <u>**Customary International Law**</u>

The prohibition of the execution of the severely mentally ill has also long been a customary norm of international humanitarian law, to which all states are bound regardless of whether they have ratified a treaty to that effect. Customary norms are created when two elements are present: (1) state practice consistent with the norm and (2) *opinio juris*, that is, an *official* acceptance of the norm by the international community.  As to the matter of consistent state practice, the U.S. Supreme Court has acknowledged the fact that "for centuries no jurisdiction has countenanced the

---

[1] The United States of America's reservations read in pertinent part "(2) [t]hat the United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment."

11

execution of the insane." *Ford v. Wainwright*, 477 U.S. at 401. Professors Geoffrey Hazard and David Louisell authoritatively state that "[b]y the law of all common law jurisdictions, and, as far as we know, the law of all civilised nations, a person who is insane cannot be punished." Geoffrey C. Hazard, Jr. & David W. Louisell, *Death the State, and the Insane*, 9 UCLA L.Rev. 381, 381 (1962). Having exhaustively scrutinised relevant U.N. documents, William A. Schabas discerns that "[t]here is in fact no empirical evidence that any state actually executes the insane, even though many have no legislative provisions to this effect." William A. Schabas, "International Norms on Execution of the Insane and the Mentally Retarded," 4 *Criminal Law Forum* 95, 113-114 (1993). By common consensus, it is evident that state practice *consistently* and universally proscribes the execution of the severely mentally ill.

Having established that the prohibition is a matter of consistent state practice, a satisfaction of the requirement of *opinio juris* to achieve customary status may be readily inferred from the U.N. Economic and Social Council Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty, E.S.C. Res. 1984/50, U.N. ESCOR, Supp. No. 1, at 33, U.N. Doc. E/1984/92 (1984) (hereinafter the U.N. Safeguards). The Safeguards, adopted in 1984 by U.N. General Assembly resolution, received almost unanimous support from U.N. state party members and forbid the application of the death penalty "on persons who have become insane." *Id*.

It is well recognised that "declaratory pronouncements [by international organizations] provide some evidence of what the states voting for it regard the law to be ... and if adopted by consensus or virtual unanimity [such declaratory pronouncements] are given substantial weight." Restatement (Third) of the Foreign Relations Law of the United States, § 103 cmt. c. This prohibition was expanded in 1989 by the Economic and Social Council, in its clarification of Safeguard 3, to not only preclude the execution of the "insane," but also to eliminate the death

12

penalty for "persons suffering from mental retardation or *extremely limited mental competence*, whether at the stage of sentence or execution." United Nations Economic and Social Council, *Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty*, ECOSOC Res. 1989/64, U.N. Doc. E/1989/91 (1989), at 51, ¶ 1(d) In 1996, the Council reiterated its call for full implementation of the Safeguards, in part because of concerns for the lack of protection from the death penalty of those who are severely mentally disabled. United Nations Economic and Social Council, *Implementation of the Safeguards Guaranteeing Protection of the Rights of those Facing the Death Penalty*, ECOSOC Res. 1996/15, U.N. Doc. E/CN.15/1996/15 (23 July 1996).

Moreover, since 1997, the United Nations Human Rights Commission [hereinafter the Commission] has repeatedly called on countries that maintain the death penalty to observe the U.N. Safeguards. U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/1997/12 (1997); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/1998/8 (1998). Since 1999, the resolution has been adopted with additional language, expanding the scope of the prohibition, urging retentionist countries "[n]ot to impose the death penalty on a person suffering from *any form of mental disorder* or to execute any such person." U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/1999/61 (1999); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2000/65 (2000); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2001/68 (2001); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2002/77 (2002); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2003/67 (2003); U.N. Commission on Human Rights, *Question of the Death Penalty*, U.N. Doc. E/CN.4/2004/67 (2004).

In 1989, the UN Economic and Social Council passed a resolution recommending Member States to take steps to "eliminate[e] the death penalty for persons suffering from mental retardation or extremely limited mental competence, whether at the stage of sentence or execution." U.N. ECOSOC, Implementation of the Safeguards Guaranteeing Protection of Rights of those Facing the Death Penalty, p. 51, para. 1(d), U.N. Doc. E/1989/91, May 24, 1989. The UN Commission on Human Rights has also adopted several resolutions urging all states not to execute any person "suffering from any form of mental disorder." *See, e.g.*, U.N. Office of the High Commissioner for Human Rights, The Question of the Death Penalty, E/CN.4/RES/2003/67, Apr. 25, 2003.

The prohibition on executing the severely mentally ill is an established and universally recognized customary norm of international law. More importantly, it is evident that the prohibition is not so narrowly tailored as to only exempt "the insane" from execution but, more broadly, the prohibition extends to those of extremely limited mental competence. As such, regardless of any finding of insanity under *Ford*, international standards should inform a reinterpretation and expansion of the Eighth Amendment's prohibition of the execution of the "insane" to incorporate the broader class of individuals who suffer from severe mental illness.

D. *Jus cogens*

In addition, as a customary norm of international humanitarian law, the prohibition on the execution of the severely mentally ill has acquired the character of *jus cogens*, a peremptory norm of general international law accepted and recognized by the international community of states as a binding obligation from which *no derogation* is permitted, regardless of the circumstance.

Article 53 of The Vienna Convention on the Law of Treaties, 1969, 1155 U.N.T.S. 331 [hereinafter the Vienna Convention], relates the primacy of *jus cogens*:

> "A treaty is void if, at the time of its conclusion, it conflicts with a peremptory norm of general international law. For the purposes of the present Convention, a peremptory norm of general international law is a norm accepted and recognized by the international community of states as a whole as a norm from which no derogation is permitted and which can be modified only by a subsequent norm of general international law having the same character."

The contention that the prohibition of the execution of the severely mentally ill has acquired such character is supported by the International Law Commission [hereinafter the ILC]. The ILC has tendered the view that the prohibition of any human rights violation may legitimately be regarded as *jus cogens*. International Law Commission Commentary on Article 64 of the Vienna Convention on the Law of Treaties 1969, Y.B.I.L.C., 1966, II, pp. 247-248. "State conduct that is regarded as so fundamentally unacceptable by international society as to be contrary to rules of *jus cogens* and obligations *erga omnes* can be seen to … overlap substantially with the catalogue of acts prohibited by the customary international law of human rights." Harris David J., *Cases and Materials on International Law*, London: Sweet & Maxwell, 1998, p. 837. In short, "no derogation is permitted" by the United States from the international prohibition on executing the severely mentally ill, by virtue of its status as a peremptory norm of international humanitarian law possessing the character of *jus cogens*. United States courts have consistently recognized the primacy of *jus cogens* norms. *E.g., Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir.1992); *Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir.1980); *Committee of U.S. Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939-40 (D.C. Cir. 1988). The Supreme Court has reaffirmed that the breach of an obligatory international norm is actionable under federal law. *See Sosa v. Alvarez-Machain*, 124 S. Ct. 2739, 2766-68 (2004).

In short, the execution of an individual with significant neurocognitive impairments and severe psychiatric disorders is a direct violation of Article 6, § 1 of the ICCPR, and thus a breach

of international law. The United States ratified this international treaty and is, therefore, bound to respect both its provisions and, more specifically, Article 6, § 1. A treaty is binding law under the Supremacy Clause, and the courts must give it full effect. Thus, Mr. Coonce's execution would be unlawful.

## CONCLUSION

Based upon the above arguments, the Eighth Amendment to the United States Constitution, and international law, Defendant Coonce respectfully requests an Order barring the government from seeking the death penalty in the instant case.

In the event the Court denies Defendant Coonce's motion for an Order precluding the government from seeking the death penalty, Defendant requests an instruction that if one or more jurors determines that Defendant Coonce is seriously mentally ill or suffers from an intellectual disability, that the jurors must then cease deliberations and report that finding to the Court with the understanding the Court will impose a sentence other than death.

Respectfully submitted this 28th day of May, 2014.

ATTORNEYS FOR WESLEY P. COONCE

*/s/ Thomas D. Carver, #23319*
Thomas D. Carver
Shane P. Cantin
CARVER, CANTIN & GRANTHAM
901 St. Louis St., Suite 1600
Springfield, MO 65806
(417) 831-6363
(417) 831-7373 Fax
tom@c2glaw.com
shane@c2glaw.com

Matthew M. Rubenstein (Or. Bar No. 061491)
Capital Resource Counsel Project
Hosted by the Federal Public Defender for the
District of Oregon
101 SW Main Street, Suite 1700
Portland Oregon 97204-3225
Phone: 503-780-3535
Fax: 866-256-0290
matt@matthewrubenstein.com

CERTIFICATE OF SERVICE

    I certify that the foregoing was filed electronically through the ECF system and notice sent to all parties of record on this 28th day of May, 2014.

*/s/ Thomas D. Carver*